IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

TERESA ADKINS              )
                           )
        Plaintiff,         )
                           )
   v.                      ) Case No.09-3227-CV-S-REL-SSA
                           )
MICHAEL J. ASTRUE, Commissioner)
of Social Security,        )
                           )
        Defendant.         )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Teresa Adkins seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for a period of disability and disability insurance benefits under Title II of the Social Security Act ("the Act"), and supplemental security income under Title XVI of the Act. 42 U.S.C. §§ 401 and 1381. Plaintiff argues that the administrative law judge (ALJ) (1) improperly performed the credibility analysis concerning plaintiff's claims of disability, (2) failed to give proper deference to the opinions of plaintiff's treating psychiatrist, and (3) failed to properly consider the medical records when assessing plaintiff's residual functional capacity (RFC). I find that the ALJ did not err as alleged. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

# I. BACKGROUND

This suit involves an application for a period of disability and Disability Insurance Benefits under Title II of the Social Security Act (the Act), and Supplemental Security Income under Title XVI of the Act. 42 U.S.C. §§ 401 and 1381. The Act provides for judicial review of a "final decision" of the Commissioner of the Social Security Administration. Id. §§ 405(g); 1383(c)(3).

Plaintiff applied for benefits on January 17, 2006 (Tr. 61, 62). In both applications, plaintiff stated she became disabled on December 1, 2004 (Tr. 9, 152-55). Plaintiff's application was denied on May 31, 2006, and she appealed the denial to the Honorable Linda D. Carter, ALJ (Tr. 64, 70). The ALJ held an administrative hearing on January 20, 2009 (Tr. 22-55). In a March 6, 2009, decision, the ALJ found that plaintiff was not disabled (Tr. 6-21). Plaintiff filed a Request for Review of Hearing Decision with the Appeals Council on March 31, 2009 (Tr. 57). The Appeals Council denied plaintiff's request for review on May 19, 2009 (Tr. 1). Therefore, the ALJ's decision is the final action of the Commissioner, and is subject to judicial review under 42 U.S.C. § 405(g).

# II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for

judicial review of a "final decision" of the Commissioner under Title II. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987) (citing Steadman v. Sec. & Exch. Comm'n, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way,

without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Griffon v. Bowen, 856 F.2d 1150, 1153-54 (8th Cir. 1988); McMillian v. Schweiker, 697 F.2d 215, 220-21 (8th Cir. 1983).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are

codified at 20 C.F.R. §§ 404.1501, <u>et seq.</u> The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.  Is the claimant performing substantial gainful activity?
        Yes = not disabled.
        No = go to next step.

2.  Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

        No = not disabled.
        Yes = go to next step.

3.  Does the impairment meet or equal a listed impairment in Appendix 1?

        Yes = disabled.
        No = go to next step.

4.  Does the impairment prevent the claimant from doing past relevant work?

        No = not disabled.
        Yes = go to next step where burden shifts to Commissioner.

5.  Does the impairment prevent the claimant from doing any other work?

        Yes = disabled.
        No = not disabled.

## *IV. THE RECORD*

The record consists of the testimony of plaintiff and vocational expert Lesa Keen, in addition to documentary evidence admitted at the hearing.

## A. ADMINISTRATIVE REPORTS

### 1. Earnings Report

Plaintiff's earning report shows the following income for the years indicated:

| | |
|------|------------|
| 1987 | $1,760.40 |
| 1988 | None |
| 1989 | $3,748.36 |
| 1990 | $8,879.08 |
| 1991 | $2,628.22 |
| 1992 | $7,173.26 |
| 1993 | $8,034.19 |
| 1994 | $332.50 |
| 1995 | $1,786.45 |
| 1996 | None |
| 1997 | None |
| 1998 | $8,795.15 |
| 1999 | None |
| 2000 | $4,775.64 |
| 2001 | $6,407.25 |
| 2002 | $16,587.50 |
| 2003 | $13,427.48 |
| 2004 | $14,034.74 |
| 2005 | None |
| 2006 | None |
| 2007 | None |
| 2008 | None |

(Tr. 147.)

### 2. Disability Report

In a February 8, 2006, disability report (Tr. 152-66), plaintiff gave her alleged onset date as December 1, 2004 (Tr. 152).

The interviewer reported that plaintiff had no difficulty with

hearing, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using hands, or writing (Tr. 154). The interviewer observed that plaintiff seemed to be easily distracted by other people and noises in the office, and was very talkative and difficult to keep on track (Tr. 154).

Plaintiff gave her height as 5'11" and her weight as 167 pounds (Tr. 156).

Plaintiff reported being on medical assistance (Tr. 156).

Plaintiff said that her illnesses included bipolar disease, schizophrenia, manic depression, hepatitis C, and back problems; she reported being unable to work due to poor concentration, inability to focus for a long time, short-term memory problems, back pain, inability to sit or stand for very long, and inability to ride in a car very long (Tr. 157).

Plaintiff reported getting fired from her last job on November 30, 2004, "for unknown reasons" (Tr. 157).

Plaintiff's prior employment included work as a babysitter, office manager, production worker, store clerk, and miscellaneous temporary jobs (Tr. 158). Plaintiff held the office manager position for the longest period of time (Tr. 158). The job description included billing, accounts receivable, customer

relations, answering phones, and programming a computer to run radio commercials (Tr. 158). As an office manager, plaintiff would walk one hour, stand 30 minutes, and sit eight hours; she would reach for eight hours and write, type or handle small objects for eight hours a day (Tr. 158-59). The heaviest object plaintiff lifted was less than 10 pounds and she frequently lifted objects weighing less than 10 pounds (Tr. 159).

Plaintiff listed the following medications for the indicated problems:

| | |
|---|---|
| Caracal | Sleep |
| Lithium | Chemical imbalance |
| Niobean | Chronic pain |
| Neurotin | Mood stabilizer |
| Prozac | Depression |
| Soma | Muscle relaxant for spasms |

(Tr. 164.)

Plaintiff reported four or more years of college, which she completed in 2001 (Tr. 165).

## 3.   Disability Report

In an undated disability report (Tr. 176-82), plaintiff reported that she was then taking the following medications for the conditions indicated:

| | |
|---|---|
| Colace | Stool softener |
| Combivent inhaler | Allergies |
| Fonase | Allergies |
| Ketoconazole cream | Allergies |

| Lithium | Chemical imbalance |
| Niobean | Chronic pain |
| Prozac | Depression |
| Seroquel | Mental |
| Soma | Pain |
| Topamax | Mental |

(Tr. 179).

Concerning her activities, plaintiff reported that she could not lift anything very heavy, and she had become more withdrawn (Tr. 180).

## B. SUMMARY OF MEDICAL RECORDS

On June 5, 2004, plaintiff, then age 33, went to the Ozarks Medical Center and was evaluated by Dr. Elizabeth Bhargava, M.D., a psychiatrist, for depression (Tr. 234-36). Plaintiff said she was undergoing a great deal of marital problems because her husband was not around and had been abusive (Tr. 234). Plaintiff acknowledged having three children (then ages 14, 12, and 9) who were in the custody of their fathers (Tr. 234). Plaintiff reported being anxious about getting picked up by the police because she had bench warrants for bad checks (Tr. 234). Plaintiff reported difficulties with depressed mood, fatigue, focusing, and feelings of worthlessness (Tr. 234). Plaintiff stated she last smoked marijuana in February of 2004, and denied overusing her prescribed medications that included Lorcet (non-narcotic pain medication) and

Percocet (narcotic pain medication) (Tr. 235). Plaintiff reported having been married twice: the first ending after four years and the second lasting five years (Tr. 235). Plaintiff was assessed with major depressive disorder and a GAF (global assessment of functioning) score of 30[1] (Tr. 235).

On June 21, 2004, after a protracted stay at Ozarks Medical Center, plaintiff was seen by Thomas N. Thomas, M.D., and was discharged with a diagnosis of major depressive disorder, recurrent, severe, without psychotic features, and was given a GAF score from 65 to 70[2] (Tr. 248). The doctor observed that plaintiff looked "remarkably improved" (Tr. 248). The doctor wrote: "The patient is competent, in my opinion, I having assessed her today, to resume the increased risk of a less-restrictive milieu" (Tr. 248).

---

[1]A global assessment of functioning of 21 to 30 means behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends).

[2]A global assessment of functioning of 61 to 70 means some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

On June 29, 2004, plaintiff was readmitted to the Ozarks Medical Center and seen again by Dr. Elizabeth Bhargava, M.D., (Tr. 229-30). The notes reflect that after discharge from Ozarks Medical Center a week earlier, plaintiff went to Christos House for pharmacotherapy, "which she either didn't take or overdosed on" (Tr. 229). Plaintiff showed psychotic behavior appearing to be confused with flat and restricted affect along with mumbling in a slurred manner with significant blocked thinking (Tr. 229). Plaintiff was admitted for major depressive disorder recurring, severe with psychosis and given a GAF score of 15[3] (Tr. 229). The plan was to review and reinstate plaintiff's medications according to indication and tolerance (Tr. 230).

On July 3, 2004, plaintiff was discharged from Ozarks Medical Center with a diagnosis of schizoaffective disorder, depressed type versus major depressive disorder recurring with psychosis, assessed a GAF score of 44[4] and was prescribed Wellbutrin (used to treat

_____

[3]A global assessment of functioning of 11 to 20 means some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) or occasionally fails to maintain minimal personal hygiene (e.g., smears feces) or gross impairment in communication (e.g., largely incoherent or mute).

[4]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social,

seasonal affective disorder) and Seroquel (used to treat schizophrenia) (Tr. 231-32). The notes reflect that plaintiff had been admitted to Christos House but she was noncompliant with her medications while there (Tr. 231). Plaintiff's physical examination revealed no significant problems (Tr. 231). Plaintiff's urine screen upon admission was positive for benzodiazepines (a drug used for anxiety, panic, agitation, seizures, muscle spasms, alcohol dependence, and insomnia) (Tr. 232). Upon release, plaintiff's mood had improved and she was no longer as psychomotor retarded (Tr. 232).

On July 20, 2004, plaintiff was admitted to the St. John's Regional Medical Center for an increased level of depression with suicidal ideation (Tr. 215-16). Plaintiff acknowledged a history of methamphetamine abuse and said she last used the drug between October and May (Tr. 215). Plaintiff's urine drug screen was negative (Tr. 216).

On August 12, 2004, plaintiff was discharged from St. John's Medical Center with a diagnosis of major depression, single episode, with psychotic features, severe, history of

---

occupational, or school functioning (e.g., no friends, unable to keep a job).

methamphetamine abuse and a GAF score of 52[5] (Tr. 213-14). After more than three weeks of hospitalization, plaintiff was found to have no alcohol in her system and her urine drug screen was negative (Tr. 213). Due to medication management and electroconvulsive therapy during her stay, plaintiff was noted to have shown significant improvement in her symptoms and was subsequently stable when discharged (Tr. 214). Upon discharge, she was prescribed Risperdal (used to treat schizophrenia) to help control the psychotic symptoms associated with her depression, Vioxx (anti-inflammatory) for her pain, Prozac for her depression and Lorazepam for her severe anxiety (Tr. 214). The notes conclude that plaintiff experienced "significant improvement in her symptoms" and she was "feeling significantly better and ready for dismissal" (Tr. 214).

(Plaintiff's alleged onset date is December 1, 2004 (Tr. 152).)

On March 23, 2005, plaintiff went to Ozarks Medical Center Behavioral Health Center in the Rural Health Clinic, and saw

---

[5]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

therapist Bruce Harms, LCSW (licensed clinical social worker) (Tr. 244-49). Plaintiff complained of mood swings and sleep difficulties (Tr. 244). Plaintiff reported a long history of marijuana and methamphetamine abuse (Tr. 245, 249). Plaintiff stated she last used marijuana on March 22, 2005, and last used methamphetamine in May of 2004 (Tr. 245). Plaintiff claimed she had been hospitalized in the past, but had not benefitted from hospitalization in the long term because she failed to take her medications (Tr. 244). Plaintiff claimed she was "very stable" when she did take medication (Tr. 244). Mr. Harms assessed bipolar disorder and polysubstance abuse in remission, and assigned plaintiff a GAF score of 50-53[6] (Tr. 247). The notes reflect that plaintiff had no source of income, her husband was then on SSI disability, and that she was applying for Medicaid (Tr. 246). Concerning her daily activities, the notes said that plaintiff had "a decent ability to

---

[6]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

take care of herself and difficult time managing money most of the time" (Tr. 246).

On April 20, 2005, plaintiff was seen at the Clarke Orthopedic Clinic by Dr. Michael Clarke, M.D., F.A.C.S, (Fellow, American College of Surgeons) for a Medicaid evaluation (Tr. 250-51). Plaintiff reported having upper and lower back pain along with neck pain (Tr. 250). X-rays of plaintiff's neck showed no significant ligamentous instability and disc spaces were well-maintained with minimal degenerative changes (Tr. 251). X-rays of plaintiff's lumbosacral spine showed mild facet changes at L3-L4 and L4-L5 with no other significant abnormality (Tr. 251). Dr. Clarke opined that plaintiff had very minor degenerative changes in her lower back and neck but that it should not prevent her from work as she had been trained (Tr. 251).

On April 29, 2005, plaintiff saw Lori Baker, MSW (master of social work), LCSW, an outpatient therapist, for an individual psychotherapy session (Tr. 276). Plaintiff told Lori Baker that she felt stressed because her husband was going to prison (Tr. 276). Plaintiff was observed with an anxious mood, and she reported problems with depressed moods, mood swings, insomnia and chronic pain (Tr. 276). Plaintiff reported pain in her upper back and left hip rated as an 8 on a scale of 1- 10 (Tr. 276). Plaintiff was

diagnosed with bipolar disorder, depression, and was given a GAF score of 51-53[7] (Tr. 276).

On May 4, 2005, plaintiff saw Colleen Haynie, MSN, CS, RN, for a psychiatric evaluation for her bipolar disorder during which plaintiff reported having a low energy level, crying spells, feeling helpless, worthless, restless and guilty with mood swings, poor concentration, memory problems and racing thoughts (Tr. 270-71). Plaintiff reported that she had been out of her medication for three to four months because she moved and lost her Medicaid coverage (Tr. 270). Plaintiff revealed that her husband was on his way to prison after having been found in possession of two pounds of methamphetamine (Tr. 270). Plaintiff said she had been taking Seroquel on a daily basis until three to four months ago when she moved and lost coverage (Tr. 270). Plaintiff reported having back pain from an automobile accident and rated her pain as a 7 or 8 on a scale of 1-10 (Tr. 271). Plaintiff disclosed that she last used methamphetamine a year earlier, and last used marijuana two weeks earlier (Tr. 271). Plaintiff was assessed with bipolar disorder and

_____

[7]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

polysubstance dependence, and was given samples of Seroquel (Tr. 271).

On May 12, 2005, plaintiff went to a medical clinic to have her prescriptions refilled (Tr. 254). Plaintiff was diagnosed with bipolar disease and psychosis (Tr. 254). She denied any auditory or visual hallucinations (Tr. 254). Plaintiff admitted to using marijuana a month earlier (Tr. 254). Plaintiff completed a blood test, which showed possible hepatitis C (Tr. 264). Plaintiff also completed a drug test, which was positive for marijuana (Tr. 263).

On June 8, 2005, plaintiff saw Dr. Bhargava and reported her depression was at a 6 on a scale of 1-10 (Tr. 272). Plaintiff additionally reported occasionally hearing her husband's voice, who was then in jail. Plaintiff reported that she was doing better, and she appeared to be less depressed and with more energy (Tr. 272). Dr. Bhargava noted that plaintiff spoke rapidly, but had a coherent thought process and an appropriate affect (Tr. 272). Plaintiff reported that her three children were living with their father and her grandmother but that she was seeing them frequently (Tr. 272). The notes reflect that the therapist, Colleen Haynie, thought plaintiff's depression was related to the situation with plaintiff's husband, and that plaintiff did not appear to be that depressed and had a lot of energy (Tr. 272). Dr. Bhargava assessed

plaintiff as "doing better" (Tr. 272). Plaintiff was diagnosed with bipolar disorder, most recent episode depressed, and was instructed to continue with Seroquel at a decreased amount along with Neurontin (pain medication) (Tr. 272).

On June 9, 2005, plaintiff saw Lori Baker, a therapist, for individual psychotherapy (Tr. 277). Ms. Baker noted that plaintiff reported concentration problems and was in a "somber" mood (Tr. 277). Ms Baker observed that plaintiff's progress toward treatment goals was "very slow" (Tr. 277). Plaintiff reported no pain (Tr. 277). Plaintiff was assessed with a GAF of 51-53[8] (Tr. 277).

On August 4, 2005, plaintiff saw Connie Haynie, APRN, BC, concerning her psychiatric conditions (Tr. 273). Plaintiff said that her sleep patterns varied from 6 to 9 hours per night (Tr. 273). Plaintiff reported that her appetite was okay, she bathed and showered on a daily basis, and that some days she enjoyed life (Tr. 273). Plaintiff reported having crying spells, frightening and racing thoughts at times, feeling anxious and paranoid, along with occasionally hearing voices (Tr. 273). Plaintiff stated she was

_____

[8]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

going to Narcotic's Anonymous meetings on a regular basis (Tr. 273). Plaintiff reported having continuous problems with her husband, who was then jailed in Florida (Tr. 273). Plaintiff was observed as having pressured speech, flight of ideas, and illogical flow of thought (Tr. 273). Plaintiff was assessed with bipolar disorder, and polysubstance dependence with improvement (Tr. 273). The plan was to increase plaintiff's Seroquel and Neurontin (Tr. 273).

On August 31, 2005, plaintiff saw Dr. Bhargava for continued treatment regarding her bipolar disorder (Tr. 274). Plaintiff told Dr. Bhargava that she worried about her husband's legal issues because he had operated as an informant and the persons on whom he had informed might take it out on her (Tr. 274). Plaintiff claimed she had not smoked any marijuana for three weeks (Tr. 274). Plaintiff reported her depression as a 7 on a scale of 1-10 along with increased anxiety but without any full panic attacks (Tr. 274). Plaintiff was observed as stable on her vital parameters, with a depressed mood, had a mildly anxious affect, and rapid, but not pressured, speech (Tr. 274). Plaintiff was prescribed Prozac to be taken in conjunction with her Seroquel and Neurontin (Tr. 274).

On October 26, 2005, plaintiff saw Dr. Bhargava for her bipolar disorder and reported increased worrying and hearing voices

19

(Tr. 275). Plaintiff reported being worried about her boyfriend (Tr. 275). Plaintiff complained to Dr. Bhargava that she spent a couple days in jail because she had overdrawn her bank account (Tr. 275). Plaintiff claimed she slept well, but experienced auditory hallucinations (Tr. 275). On examination, plaintiff's vital parameters were stable (Tr. 275). Plaintiff was observed as being moderately depressed and as having a restricted affect and with auditory hallucinations (Tr. 275). Plaintiff's Prozac and Seroquel dosages were increased and she was continued on Neurontin (Tr. 275).

On April 11, 2006, David Lutz, Ph.D., completed a consultative mental examination at the request of the state disability determination services (DDS) (Tr. 281–88). During the examination, plaintiff, then age 35, said she had completed college and earned a B.S. degree in business administration (Tr. 282). Plaintiff reported she suffered from bipolar disorder and described herself as being mellow with mood swings ranging from a good mood to being depressed (Tr. 281). Plaintiff reported problems with hearing men's voices over the past two years telling her not to take her medication and other negative statements such as not listening to others (Tr. 281). Plaintiff reported she felt that if others looked at her in a public place, the voices might be trying to communicate

with her in a telepathic manner (Tr. 281). Plaintiff reported she last used methamphetamine one year earlier and stopped using marijuana six months earlier (Tr. 282). Plaintiff said she had been in a drug court for the past three weeks where she was required to call in every morning for random urinalyses (Tr. 283). Plaintiff reported she took her medications as prescribed and that they had been helpful in reducing her depression, sleep problems, and psychotic symptoms (Tr. 283). Plaintiff said she initially did not take her medications because she did not understand her difficulties (Tr. 283-284). Plaintiff stated she shopped very little because she felt others were watching her, and she had difficulty going to sleep because her mind would not shut down (Tr. 284). Plaintiff told Dr. Lutz that her daily activities included watching "reality shows" on television, helping a friend's mother with chores, reading "throughout the day," listening to music, spending time outside with her children, and, at times, shopping and performing yardwork (Tr. 284). He also noted that plaintiff had pressured speech and poor judgment (Tr. 285). The doctor found that plaintiff had low-average to average memory and intelligence (Tr. 285). Dr. Lutz diagnosed polysubstance dependence and possible

bipolar disorder II, and assessed a GAF score of 60[9] (Tr. 286). He attributed plaintiff's "dysfunctional personality characteristics" to her "past drug usage" (Tr. 286). Dr. Lutz opined that plaintiff could understand and remember simple and complex instructions, and could sustain the concentration and persistence necessary for moderately complex tasks (Tr. 286). He believed that plaintiff could interact in "at least" moderately demanding social situations and could adapt to her environment (Tr. 286). Dr. Lutz opined that if plaintiff suffered from bipolar disorder I, then his assessments regarding plaintiff's abilities to understand and remember instructions, sustain concentration and persistence and her ability to interact socially would need to be decreased substantially as she would have difficulty sustaining such behavior on a consistent basis (Tr. 286).

On May 23, 2006, Elisa Lewis, Ph.D., a DDS psychologist, completed a current Mental Residual Functional Capacity Assessment (Tr. 302-304). After reviewing plaintiff's medical records covering the period from December 1, 2004 through May 23, 2006 (Tr. 289-

_____

[9]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

301), Dr. Lewis opined that plaintiff suffered from bipolar disorder II and a substance-addiction disorder (Tr. 292, 297). The doctor determined the following as to plaintiff's capacity:

1    The ability to remember locations and work-like procedures. **Not significantly limited.**

2    The ability to understand and remember very short and simple instructions. **Not significantly limited.**

3    The ability to understand and remember detailed instructions. **Not significantly limited.**

4    The ability to carry out very short and simple instructions. **Not significantly limited.**

5    The ability to carry out detailed instructions. **Not significantly limited.**

6    The ability to maintain attention and concentration for extended periods. **Not significantly limited.**

7    The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. **Not significantly limited.**

8    The ability to sustain an ordinary routine without special supervision. **Not significantly limited.**

9    The ability to work in coordination with or proximity to others without being distracted by them. **Not significantly limited.**

10    The ability to make simple work-related decisions. **Not significantly limited.**

11    The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. **Not significantly limited.**

12    The ability to interact appropriately with the general public. **Markedly limited.**

13    The ability to ask simple questions or request assistance. **No evidence of limitation in this category**.

14    The ability to accept instructions and respond appropriately to criticism from supervisors. **Not significantly limited.**

15    The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. **Moderately limited.**

16    The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. **Not significantly limited.**

17    The ability to respond appropriately to changes in the work setting. **No evidence of limitation in this category**.

18    The ability to be aware of normal hazards and take appropriate precautions. **No evidence of limitation in this category**.

19    The ability to travel in unfamiliar places or use public transportation. **No evidence of limitation in this category**.

20    The ability to set realistic goals or make plans independently of others. **No evidence of limitation in this category**.

(Tr. 302-03.)

On May 24, 2006, plaintiff, then age 35, saw Ms. Loretta Baker, LCSW, for an annual assessment (Tr. 355-58). Plaintiff reported feeling depressed, irritable, and worthless along with suffering from insomnia, crying spells, and was experiencing

problems with concentration (Tr. 355). Plaintiff related that her manic symptoms included intense irritability, anger, racing thoughts, distractability, pressured speech, and compulsive behaviors (Tr. 355). Plaintiff reported that she had been arrested in November of 2005, and spent seven weeks in jail for an incident involving marijuana and drug paraphernalia (Tr. 355). Plaintiff also reported spending two weeks in jail for bad checks (Tr. 355). Plaintiff told Ms. Baker that she last used marijuana in November 2005, last used methamphetamine in February 2006, and last used Oxycontin (narcotic pain reliever) in October or November 2005 (Tr. 355). Plaintiff reported receiving drug and alcohol individual and group therapy through a drug court (Tr. 355, 357). Ms. Baker noted that plaintiff appeared nervous and distractible, and had impaired immediate memory and a normal mood (Tr. 356). Plaintiff was diagnosed with bipolar disorder I, most recent episode depressed, with psychotic features, history of polysubstance dependence, early full remission and with a GAF score of 51-53[10] (Tr. 357).

On June 7, 2006, plaintiff saw Dr. Bhargava for continued

---

[10]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

treatment for her bipolar disorder (Tr. 353-54). Plaintiff stated she had been compliant with her medications, although she had run out of medication "over the last week or so" (Tr. 353). Plaintiff told Dr. Bhargava that she gone to jail for a couple of months for passing a bad check (Tr. 353). Plaintiff denied using any alcohol or illegal drugs (Tr. 353). Plaintiff claimed she was sleeping adequately and had a fairly good mood (Tr. 353). Dr. Bhargava noted that plaintiff was "doing better," continued her on Prozac and Seroquel, and prescribed Topomax (an anticonvulsant drug used for pain) to replace Neurontin (Tr. 353).

On August 4, 2006, plaintiff saw Ms. Loretta Baker, LCSW, for individual therapy (Tr. 351-52). Ms. Baker noted that plaintiff's mood was normal and her affect was congruent with her mood (Tr. 351). Plaintiff reported being irritable, depressed, angry, worried, paranoid, lonely, and frustrated along with problems concentrating, sleeping, having mood swings, low appetite, and having a lack of interest in activities (Tr. 351). Plaintiff continued to participate in the drug court but did not have housing (Tr. 351). Ms. Baker assessed plaintiff with a GAF score of 48-50[11]

---

[11]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to

(Tr. 351).

On August 6, 2006, plaintiff went to the emergency room via ambulance and complained of nausea and vomiting (Tr. 330-33). Plaintiff was diagnosed with gastroenteritis, and was discharged (Tr. 331).

On August 16, 2006, plaintiff saw Dr. Bhargava (Tr. 349-50). Plaintiff reported feeling less depressed but continued to have mood swings (Tr. 349). Plaintiff told Dr. Bhargava that she was doing fairly well on her current medications, but had run out and could not get a refill (Tr. 349). Plaintiff reported sleeping well with Seroquel (Tr. 349). Plaintiff's urine drug screen was negative (Tr. 349). Plaintiff was diagnosed with bipolar disorder, cannabis dependence in early remission and was assessed a GAF score of 58[12] (Tr. 349).

On September 18, 2006, plaintiff saw Ms. Loretta Baker, LCSW, for individual therapy (Tr. 347-48). Plaintiff was on time, casually dressed, and adequately groomed (Tr. 347). Plaintiff's

keep a job).

[12]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

mood was normal and her affect was congruent with her mood (Tr. 347). Plaintiff reported some problems with her boyfriend's jealousy, and was educated about abusive relationships (Tr. 347). Ms. Baker gave plaintiff a GAF score of 54-57[13] (Tr. 347).

On October 30, 2006, plaintiff saw Ms. Loretta Baker, LCSW, for individual therapy (Tr. 345-46). Plaintiff was on time, casually dressed, and adequately groomed (Tr. 345). Plaintiff's mood was normal and her affect was congruent with her mood (Tr. 345). Ms. Baker assigned plaintiff a GAF score of 54-57[14] (Tr. 345).

On November 29, 2006, plaintiff saw Dr. Bhargava and reported that she was gaining weight and that the Seroquel was not helping with her sleeping, but she was otherwise doing "fairly well" (Tr. 343). Plaintiff also reported hearing the voice of her ex-husband who told her mean things (Tr. 343). Plaintiff's mood was fair, her affect was restricted, her thought process was coherent, and she

---

[13]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

[14]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

was not suicidal (Tr. 343). Plaintiff was diagnosed with bipolar disorder, amphetamine dependence in early remission, cannabis dependence in early remission, and was given a GAF score of 60[15] (Tr. 343). Plaintiff was assessed as "doing better" (Tr. 343). Dr. Bhargava continued plaintiff on Prozac, tapered off Seroquel, increased Topomax, and started her on Haldol (used to treat psychotic disorders) and Lunesta (used to treat insomnia) (Tr. 343).

On November 29, 2006, Dr. Bhargava completed a mental assessment of plaintiff (Tr. 306-07). She opined that plaintiff was:

> Not significantly limited at carrying out very short and simple instructions, asking simple questions, interacting with the public, maintaining socially appropriate behavior, and being aware of hazards (Tr. 306-07);
>
> Moderately limited at remembering locations and work procedures, performing within a schedule, sustaining an ordinary routine, working with others, making simple work related decisions, completing a normal workday, interacting with supervisors and coworkers, responded to changes, traveling in unfamiliar places, and setting goals (Tr. 306-07); and
>
> Markedly limited at understanding and carrying out

---

[15]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) <u>or</u> moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

detailed instructions and maintaining attention and concentration for extended periods (Tr. 306).

On December 24, 2006, plaintiff was seen at the Texas County Memorial Hospital emergency room for back pain (Tr. 321-28). Plaintiff reported having chronic back pain for the past four years since a car wreck (Tr. 328). Examiners noted that plaintiff had intact reflexes and sensation, and exhibited no numbness or tingling (Tr. 324, 327). Plaintiff was diagnosed with a myofascial strain and sacroiliitis, and was prescribed Darvocet (a narcotic pain medication) (Tr. 324).

On December 26, 2006, plaintiff saw Ms. Collene M. Haynie, MSN, CS, RN, for her bipolar disorder and reported having sleeping problems, frequent mood swings, paranoia and auditory hallucinations (Tr. 341-42). Plaintiff stated that she had stopped taking the Haldol due to side effects. Plaintiff's affect was observed as "a little bit blunted" with fairly rapid thoughts and "a little bit of flight of ideas" (Tr. 341). Plaintiff was instructed to continue Prozac and Topomax, discontinue Lunesta, and restart the Seroquel (Tr. 341). Plaintiff was given a GAF score of 55[16] (Tr. 341).

---

[16]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or

On December 29, 2006, a MRI of plaintiff's lumbar spine showed minimal disc bulging at L2-3, L3-4, and L4-5, mild disc bulging at L5-S1, and a small left posterior disc extrusion at L5-S1; a MRI of plaintiff's thoracic spine was essentially negative without acute abnormality (Tr. 321-22).

On February 14, 2007, plaintiff, then age 36, went to the Ozarks Medical Center for an evaluation for urinary incontinence, and she was prepared for surgery (Tr. 416-17). At the time, plaintiff's weight was 188 pounds, her pulse was 80, and her blood pressure was 112/78 (Tr. 416). That day, plaintiff underwent a hysterectomy and vaginal-repair procedure (Tr. 418-19). Plaintiff was discharged two days later (Tr. 20-21).

On March 21, 2007, plaintiff saw Ms. Colleen M. Haynie, MSN, CS, RN, about her bipolar disorder (Tr. 339-40). Plaintiff reported fluctuating moods and energy levels along with frightening and racing thoughts, anxiety and paranoia (Tr. 339). Plaintiff continued to participate in a drug court where she had been tested several times for drugs (Tr. 339). Ms Haynie observed that plaintiff had "a little bit blunted" affect, was relatively well groomed, maintained eye contact, and that her flow of thought was

school functioning (e.g., few friends, conflicts with peers or co-workers).

31

not always logical (Tr. 339). Plaintiff was given a GAF score of 55[17] (Tr. 339).

On April 25, 2007, plaintiff saw Ms. Loretta Baker, LCSW, for individual therapy (Tr. 335-36). Plaintiff was casually dressed and adequately groomed, her mood was somber and her affect was congruent with her mood (Tr. 335). Plaintiff reported feeling irritable, sad, afraid, angry, worried, overwhelmed, frustrated with mood swings, problems sleeping, and had auditory hallucinations (Tr. 335). Plaintiff reported then-current stressors as including her boyfriend who was in jail and therefore unable to pay the rent (Tr. 335). Plaintiff was diagnosed with bipolar disorder and given a GAF score of 51-53[18] (Tr. 335).

On July 3, 2007, plaintiff went to Hartville Medical Center and complained of back pain (Tr. 310).

On July 18, 2007, plaintiff went to the Texas County Memorial

---

[17]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

[18]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

Hospital emergency room and reported pelvic and abdominal pain (Tr. 313–19). Plaintiff had normal range of motion in her extremities and demonstrated no motor or sensory deficits upon examination (Tr. 314). Plaintiff was diagnosed with abdominal pain and an urinary-tract infection (Tr. 314).

On September 4, 2007, plaintiff arrived at the Ozarks Medical Center emergency room by ambulance after "huff[ing] (1) can of paint" (Tr. 408–11). Plaintiff had been released from jail one week earlier (Tr. 408). Plaintiff had been out of her medications for a week and needed refills (Tr. 411).

On January 8, 2008, Missouri Department of Corrections records show that plaintiff reported a fever and ear pain (Tr. 490).

On January 10, 2008, Missouri Department of Corrections records show that a physician examined plaintiff and observed mild left-knee tenderness and diagnosed degenerative arthritis (Tr. 487). The doctor prescribed Naproxen (a pain medication) (Tr. 487).

On January 13, 2008, Missouri Department of Corrections records show that plaintiff reported foot pain to medical staff (Tr. 492-93). An examiner noted slight swelling and bruising in her right ankle and foot (Tr. 493).

On February 5, 2008, Missouri Department of Corrections records show that plaintiff reported further foot problems to the

medical staff, and was advised to wear her "shower shoes," elevate her legs when resting, and use an ice pack as needed (Tr. 493).

On April 1, 2008, plaintiff saw Dr. Arifa Salam, M.D., for the first time and stated that she had seen Dr. Bhargava until one year earlier but was then put in prison for four to five months (Tr. 337-38). The notes reflect that plaintiff had been on probation but relapsed and used drugs, which resulted in her incarceration (Tr. 337). During her time in prison, plaintiff had been taken off Seroquel and Topomax but continued on Lithium and Prozac (Tr. 337). Plaintiff reported feeling quite depressed with low energy and motivation, disturbed sleep and racing thoughts (Tr. 337). Plaintiff was alert and oriented, and her grooming and hygiene were adequate (Tr. 337). Plaintiff's eye contact was fair and her speech was spontaneous (Tr. 337). Plaintiff appeared tired but with a restricted affect (Tr. 337). Plaintiff had slow psychomotor activity (Tr. 337). The doctor observed that plaintiff showed improved insight and judgment (Tr. 337). Plaintiff reported hearing noises but denied any hallucinations, paranoia, or delusions (Tr. 337). Plaintiff was diagnosed with bipolar disorder, most recent episode depressed without psychosis, and polysubstance dependence (Tr. 337). Plaintiff was encouraged to continue with her AA meetings five times a week, and instructed to continue Lithium and

Prozac, and to restart Seroquel and Topomax (Tr. 337). Dr. Salam assigned plaintiff a GAF score of 55-60[19] (Tr. 337).

On April 7, 2008, plaintiff, then age 37, was seen at Ozarks Medical Center after police observed her inhaling pain fumes in a parking lot (Tr. 401-02). Plaintiff initially denied huffing paint but later admitted it and said she was trying to kill herself (Tr. 401). Plaintiff told the police that she had just gotten out of prison, had not huffed paint in a long time, and she had been huffing since early that morning (Tr. 401).

On April 8, 2008, plaintiff was hospitalized at the St. John's Medical Center for huffing paint (Tr. 361). Plaintiff reported she was recently released from prison and was currently living in a shelter (Tr. 363). Tabassum Saba, M.D., a psychiatrist at the hospital, examined plaintiff (Tr. 366). The doctor noted that plaintiff spoke regularly, had circumstantial thoughts, marginal insight and judgment, a normal IQ, and intact memory, concentration, and attention (Tr. 364). Plaintiff was discharged on April 10, 2008 with a diagnosis of bipolar disorder II, recent

---

[19]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

incident of huffing paint, history of polysubstance abuse, and was given a GAF score of 50-55[20] (Tr. 361). The doctor noted that plaintiff had an "[i]mproved and stable" mood (Tr. 361). Plaintiff was prescribed Seroquel and Prozac (Tr. 361).

On April 15, 2008, plaintiff was involuntarily hospitalized after she was caught inhaling paint fumes at a shelter (Tr. 389-90). On admission, plaintiff denied any thoughts of hurting herself or anyone else (Tr. 363).

On April 18, 2008, plaintiff was discharged from Ozarks Medical Center (Tr. 391-92). At that time, David Fontaine, D.O., observed that plaintiff had good range of motion, equal reflexes, intact cranial nerves, and "no cerebellar signs or symptoms" (Tr. 392). The doctor observed that plaintiff had a fair affect and neutral mood, showed no evidence of hallucinations, had intact immediate, intermediate, and remote memory, and was capable of abstract thinking (Tr. 392). Dr. Fontaine assessed plaintiff's insight and judgment as poor (Tr. 392). The doctor assessed bipolar disorder, polysubstance abuse, and borderline personality traits,

---

[20]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

and assigned a GAF score of 45[21] (Tr. 392). Plaintiff was prescribed Lithium, Celexa (used to treat depression) and Seroquel (Tr. 392).

On June 16, 2008, Missouri Department of Corrections records show that plaintiff sought care for ear problems (Tr. 521).

On June 25, 2008, Missouri Department of Corrections records show that plaintiff complained of constipation (Tr. 525).

On June 26, 2008, Missouri Department of Corrections records show that plaintiff reported muscle spasms and right-knee pain, and received Naproxen (a pain medication) (Tr. 520).

On July 2, 2008, Missouri Department of Corrections records show that plaintiff complained of an earache and was treated for excess ear wax (Tr. 528-59).

On October 14, 2008, plaintiff went to Brian Neely, M.D., at Skaggs Southside Family Clinic to establish care about five weeks after her release from prison (Tr. 551-52). Plaintiff complained of upper-back pain and spasms, and estimated her pain's intensity at 8 on a 1-10 scale (Tr. 551). Dr. Neely observed that plaintiff was in no acute distress, and had normal back range of motion (Tr.

---

[21]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) <u>or</u> any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

552). The doctor observed moderate paraspinous muscle spasms and lumbar tenderness (Tr. 552). Dr. Neely observed that plaintiff had a steady gait, symmetric reflexes, normal strength and sensation, and intact cranial nerves (Tr. 552). Dr. Neely assessed Plaintiff with bipolar disorder, degenerative disc disease, back pain, and muscle spasm (Tr. 552). Plaintiff was prescribed Baclofen (muscle relaxant), Lithium, Seroquel and Synthroid (used to treat hypothyroidism) (Tr. 552).

On November 18, 2008, plaintiff saw Dr. Neely for a follow up on her neck and back pain (Tr. 548-50). Plaintiff reported having significant pain that limited her ability to function (Tr. 548). Plaintiff reported no drug use since November of 2008, and that she was involved in an outpatient rehabilitation therapy (Tr. 548). Upon examination, plaintiff was noted to have moderate paraspinous muscle spasms and tenderness over the lumbar region (Tr. 549). Dr. Neely assessed back pain, degenerative disc disease, muscle spasms, and bipolar disorder (Tr. 549). Dr. Neely referred plaintiff to a pain-management specialist for consideration of injection therapy, and ordered lumbar spine x-rays (Tr. 549). Plaintiff was prescribed Prozac, Lithium, Seroquel and Tramadol (an opioid analgesic pain reliever) (Tr. 550).

On November 19, 2008, Dr. Neely received the x-rays for

38

plaintiff's lumbar spine which showed no fracture, subluxation or malalignment (Tr. 547).

On December 15, 2008, plaintiff saw Dr. Neely for a follow up visit on her chronic low back pain (Tr. 543). Plaintiff reported her pain had increased in the last four days with stabbing pain that radiated into her left leg (Tr. 543). Upon examination, plaintiff was noted to have moderate paraspinous muscle spasms and tenderness over the lumbar region (Tr. 544). Dr. Neely assessed plaintiff with deteriorated back pain and degenerative disc disease along with bipolar disorder (Tr. 544). Dr. Neely noted that plaintiff was awaiting a referral to pain management, and would soon begin taking new pain medication (Tr. 544). Plaintiff was instructed to take Neurontin, Tramadol and Seroquel (Tr. 544).

### C. SUMMARY OF TESTIMONY

### 1. Plaintiff's Testimony

On January 20, 2009, plaintiff appeared before the Honorable Linda D. Carter, Administrative Law Judge (Tr. 9).

On the date of the hearing, plaintiff stood 5'11" tall, weighed 213 pounds, and was 38 years old (Tr. 28).

Plaintiff testified she had been approved for vocational rehabilitation services and was on a waiting list (Tr. 29).

Plaintiff testified her back pain was the most severe

39

impairment, as she suffered from a bulging disc and a pinched nerve (Tr. 30). Plaintiff stated she had pain in her lower neck due to compressed discs that caused numbness in her left arm (Tr. 30- 31). Plaintiff said that, due to her back and neck pain, she was unable to lift anything over 5-10 pounds and had trouble bending over (Tr. 31).

Plaintiff testified she required help bringing in groceries and that was no longer able to participate in physical sports with her children (Tr. 31).

Plaintiff testified she was unable to push or pull because her doctors advised her not to do those types of activities (Tr. 31-32). Plaintiff stated she experienced severe pain when she knelt and required help to rise (Tr. 32). Plaintiff said that even with surgery on her right knee, she still experienced problems climbing stairs (Tr. 32).

Plaintiff testified that due to her back and knee problems, she was unable to sit or stand for more than 30-45 minutes at a time, needed assistance grocery shopping as she was unable to push the cart, and was only able to walk for half a block to one full block before needing to stop (Tr. 32-33).

Plaintiff testified she used to take Neurontin to help with the nerve pain in her back but was recently prescribed Percocet (an

opioid analgesic pain medication), which caused her to feel sleepy and groggy (Tr. 29-30). Plaintiff said she spoke with her doctor about the side effects of her medications and was told the sleepiness and grogginess were caused by the Percocet, and that she should take it on a minimal basis (Tr. 29-30). Plaintiff said she had been prescribed enough Percocet to take three pills a day but she averaged around two pills a day (Tr. 34).

Plaintiff testified she needed to lie down for three-to-four times a day for 30-45 minutes to 2-3 hours at a time to help alleviate the pain in her back and knees. Plaintiff said lying down also helped relieve the recent swelling in her lower legs and feet (Tr. 34). Hard surfaces and cold weather increased the pain in her back and knees (Tr. 36).

Plaintiff testified she had been diagnosed with bipolar syndrome and was being treated with medication (Tr. 39). Concerning her bipolar disorder, she experienced low phases when she felt depressed, scared, and lonely and had crying spells as frequently as she had high phases when she felt energetic and hyper (Tr. 40-41). Plaintiff estimated she had 5-10 bad days a month despite being on medication for her bipolar disorder (Tr. 43-44). Plaintiff said a bad day consisted of feeling depressed, having crying spells and lacking the motivation to get herself ready to leave the house

41

(Tr. 43-44).

Plaintiff testified she had alcohol and drug abuse problems in her past (Tr. 45). She stated she last used inhalants in April of 2008 and last used methamphetamine and marijuana in November of 2005 (Tr. 45).

Plaintiff testified she currently lived in a sobriety recovery house with 19 other women where she was required to attend several meetings a week along with attending other community meetings for her treatment recovery (Tr. 41). She was required to perform one chore (either cleaning dishes or dusting) two times per week (Tr. 42). Plaintiff indicated the sobriety recovery house had been very helpful in remaining clean from drugs (Tr. 45-46).

Plaintiff testified she had been in a 28-day treatment program in the past, and that she was currently on parole (Tr. 46).

Plaintiff testified of her problems being around large groups of people totaling more than 15-20 people, but stated she was able to get out of her house on a daily basis to attend her treatment program (Tr. 41).

## 2. Vocational Expert's Testimony

The vocational expert testified that based upon the residual functional capacity (RFC) given by the ALJ, plaintiff would not be able to perform any of her past work (Tr. 50). There would be a

variety of unskilled sedentary positions available despite such limitations (Tr. 50-51). Specifically, the vocational expert said that plaintiff could perform the representative jobs of semiconductor bonder, with 2,000 positions in the state and 115,000 nationwide; and touch-up screener, with 1,800 jobs in the state and 98,000 nationwide (Tr. 51).

The vocational expert testified that based upon additional limitations given by the ALJ, including the inability to sustain a regular schedule of work or up to two hours of concentration and attention, there would be no competitive work available (Tr. 52).

Based upon the medical source statement (mental) completed by Dr. Bhargava, the vocational expert said these limitations, if accepted a true, would preclude an individual from doing any competitive work (Tr. 52).

## D. FINDINGS OF THE ALJ

On March 11, 2009 the ALJ entered a decision denying plaintiff's applications (Tr. 6-21).

The ALJ concluded plaintiff's severe impairments were degenerative disc disease (diagnosed as sacroiliitis with disc extrusion/bulging disc) with low back pain; affective mood disorder (diagnosed as major depressive disorder with psychosis and bipolar disorder); polysubstance abuse/dependence; and degenerative joint

43

disease, status post right knee surgery (Tr. 12).

The ALJ determined that based upon the RFC, plaintiff was able to lift and carry five pounds frequently and 10 pounds occasionally; sit six to eight hours total during an eight-hour work day; stand/walk two hours total in an eight-hour work day; was unable to perform work involving exposure to or climbing of significant unprotected heights, involving exposure to potentially dangerous, unguarded moving machinery or involving commercial driving; was limited to working on an even surface that involved no exposure to extreme levels of vibration and to work that was performed in a climate-controlled environment; was limited to work that was simple and repetitive in nature (i.e., involved only one, two or three steps) and that involved no public contact, no customer service, no teamwork and minimal contact with co-workers and supervisors but could carry out work duties in proximity to co-workers and supervisors (Tr. 14).

Based upon the vocational expert's testimony, the ALJ determined that plaintiff, if she stopped abusing substances, would be unable to perform her past relevant work (Tr. 19).

The ALJ further determined that, based upon a hypothetical person with the same age, education, work experience and RFC as plaintiff including cessation of substance abuse, would be able to

perform the requirements of representative occupations for sedentary unskilled jobs (Tr. 20). The ALJ concluded that plaintiff was not disabled under the framework of Medical-Vocational Rule 201.28 (Tr. 20).

## V. PLAINTIFF'S CREDIBILITY

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

At the January 20, 2009, administrative hearing, plaintiff

45

testified that her back and neck pain prevented her from lifting anything over 5 to 10 pounds (Tr. 31). Plaintiff represented that she needed help grocery shopping and bringing in groceries, and could no longer participate in physical sports with her children (Tr. 31-33). Plaintiff explained her inability to grocery shop was based on her doctors' advice not to push and pull (Tr. 31-32). Plaintiff said that her knee problems prevented her from kneeling down because she could not get up without assistance, and she experienced knee problems when climbing stairs (Tr. 32). Plaintiff said she could only walk one block before she needed to stop (Tr. 32-33).

Plaintiff's description of her limitations is not supported by the record. I have found no limitations imposed on plaintiff by her treating physicians, and specifically no limitations concerning plaintiff's pushing and pulling.

Plaintiff's principal physical complaint involves her neck and back. The medical records show the following as to plaintiff's neck and back problems:

- On April 2, 2005, plaintiff was examined by Dr. Michael Clarke, M.D., for a Medicaid evaluation (Tr. 250-51). Dr. Clarke opined that plaintiff had very minor degenerative changes in her lower back and neck, but nothing that would prevent her from working (Tr. 251).

- On December 24, 2006, plaintiff was treated for back pain

46

at the emergency room at Texas County Memorial Hospital (Tr. 321-28). A MRI of plaintiff's thoracic spine was "essentially negative" (Tr. 322) while an MRI of her lumbar spine showed disc bulging with no evidence of spinal stenosis (Tr. 321). Plaintiff was treated with pain medication (Tr. 324).

- On October 14, 2008, plaintiff saw Dr. Brian Neely, M.D., after being released from prison, to complain about her back problems (Tr. 551-52). Dr. Neely observed that plaintiff was in no acute distress, and had normal back range of motion (Tr. 552). The doctor observed moderate paraspinous muscle spasms and lumbar tenderness, and assessed plaintiff with degenerative disc disease, back pain, and muscle spasm (Tr. 552). Dr. Neely prescribed a muscle relaxant (Tr. 552).

- On November 19, 2008, plaintiff returned to Dr. Neely for a follow-up visit about her back and neck problems (Tr. 548-50). Dr. Neely referred plaintiff to a pain clinic (Tr. 549).

- On November 19, 2008, x-rays of plaintiff's lumbar spine showed no fracture, subluxation, or malalignment (Tr. 547).

- On December 19, 2008, Dr. Neely saw plaintiff for a follow-up visit about her neck and back problems (Tr. 543). The doctor observed moderate paraspinous muscle spasms and tenderness over the lumbar area (Tr. 544). Plaintiff was instructed to take Neurontin, Tramadol and Seroquel (Tr. 544).

In short, from 2005 until the end of 2008, plaintiff's neck and back problems have been treated conservatively through the use of pain medication. There is nothing in the contemporaneous medical records that supports the notion that this physical condition is even remotely disabling.

Concerning psychiatric problems, plaintiff testified that she has been diagnosed with bipolar disorder and is being treated with medication (Tr. 39). Plaintiff said that she has good days and bad days (Tr. 40-41), and that the bad days occur about 5 to 10 times a month despite her medication (Tr. 43-44).

The first problem with plaintiff's allegation of a disabling psychiatric condition is that the medical records show her to be non-compliant with her medication and abusing illicit controlled substances, which can detract from her credibility. Choate v. Barnhart, 457 F.3d 865, 872 (8th Cir. 2006). The medical records show plaintiff failing to take her prescribed medication and/or abusing other drugs from 2004 through 2008:

- On June 29, 2004, plaintiff was admitted to the Ozarks Medical Center and the notes show that she had failed to comply with pharmacotherapy, "which she either didn't take or overdosed on," and that the plan was to reinstate the medication (Tr. 229, 231).

- On July 20, 2004, plaintiff was admitted to St. John's Medical Center for depression and the notes reflect plaintiff conceding that she had been abusing methamphetamine between October of 2003 and May of 2004 (Tr. 216).

- On March 23, 2005, plaintiff went to the Ozarks Medical Center and stated that she last used marijuana on March 22, 2005 and last used methamphetamine in May of 2004 (Tr. 245). Plaintiff acknowledged being hospitalized in the past and that she had not benefitted from long-term hospitalization because she failed to take her medications (Tr. 244). Plaintiff admitted that she was

48

"very stable" when she took her medication (Tr. 244).

- On May 12, 2005, plaintiff went to a medical clinic to have her prescriptions filled and admitted to using marijuana a month earlier (Tr. 254). Plaintiff's drug test was positive for marijuana (Tr. 263).

- On August 31, 2005, plaintiff saw her psychiatrist and had smoked marijuana three weeks earlier (Tr. 274).

- On April 11, 2006, plaintiff saw Dr. David Lutz, Ph.D., a consulting examiner, and reported that she had last used methamphetamine a year earlier and last used marijuana six months earlier (Tr. 282). Plaintiff reported being in drug court, which required her to undergo random urinalysis (Tr. 283). Plaintiff conceded that her medications helped her psychiatric problems but that she initially did not take them (Tr. 283-84). Dr. Lutz attributed plaintiff's dysfunctional personality characteristics to her past drug usage (Tr. 286).

- On May 24, 2006, plaintiff saw her social worker and reported that she had been arrested in November of 2005, and had spent seven weeks in jail for an incident involving marijuana and drug paraphernalia (Tr. 355).

- On June 7, 2006, plaintiff saw her psychiatrist and reported being compliant with her medications although she had run out of medication "over the last week or so" (Tr. 353).

- On June 29, plaintiff was readmitted to the hospital and saw her psychiatrist when she failed to be compliant with her medication (Tr. 229-30). The plan included reinstating plaintiff's medications (Tr. 230).

- On August 16, 2006, plaintiff saw her psychiatrist and reported that she was doing fairly well on her medications but had run out and could not get a refill (Tr. 349).

- On September 4, 2007, plaintiff went to an emergency room for "huffing" a can of paint and reported that she had

run out of her medications for a week (Tr. 411).

- On April 7, 2008, plaintiff was taken to the hospital after police found her "huffing" fumes in a parking lot (Tr. 361, 401-02).

- On April 1, 2008, plaintiff went to her psychiatrist and reported having spent four to five months in prison for using drugs (Tr. 337).

- On April 15, 2008, plaintiff was involuntarily hospitalized after being caught "huffing" paint at a shelter (Tr. 389-90).

The second problem with plaintiff's complaint of disabling psychiatric conditions is that the evidence shows that her symptoms (i.e., plaintiff's bad days) are brought on by situational stressors (e.g., marital problems, prospect of jail, loss of Medicaid, her abuse of drugs, and financial problems) (Tr. 213-14, 234, 270, 272, 276, 286, 335). For example, on June 8, 2005, plaintiff saw her psychiatrist and her therapist, who observed that plaintiff's depression was related to the situation with her husband who was then in jail (Tr. 272).

The third problem with plaintiff's alleged disabling psychiatric conditions is that the global assessments of functioning given to plaintiff by her treating physicians largely reflect moderate limitations except when she was being hospitalized for drug-induced problems (Tr. 213-14, 247, 248, 276, 277, 286, 335, 337, 339, 341, 343, 345, 347, 349, 357, 361).

After considering all of plaintiff's arguments, I find that the ALJ did not err by discounting plaintiff's credibility as to the disabling nature of her conditions, both physical and mental.

## VI. THE OPINIONS OF PLAINTIFF'S PSYCHIATRIST

Plaintiff complains that the ALJ failed to defer to the opinions of her treating psychiatrist, Dr. Elizabeth Bhargava, M.D.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give to the opinion of the treating physician: (1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the opinion with the record as a whole, and (6) specialization of the doctor. 20 C.F.R. § 404.1527(d)(2)-(5).

The ALJ found that Dr. Bhargava's opinions, expressed in a Medical Source Statement - Mental, were inconsistent with her

contemporaneous medical records. Dr. Bhargava opined that plaintiff was:

> Not significantly limited at carrying out very short and simple instructions, asking simple questions, interacting with the public, maintaining socially appropriate behavior, and being aware of hazards (Tr. 306-07);

> Moderately limited at remembering locations and work procedures, performing within a schedule, sustaining an ordinary routine, working with others, making simple work related decisions, completing a normal workday, interacting with supervisors and coworkers, responded to changes, traveling in unfamiliar places, and setting goals (Tr. 306-07); and

> Markedly limited at understanding and carrying out detailed instructions and maintaining attention and concentration for extended periods (Tr. 306).

As mentioned in the earlier section discussing plaintiff's credibility, Dr. Bhargava's medical records, along with those of other mental health providers, consistently show plaintiff's global assessment of functioning as moderately limited, not markedly limited. Such assessments of moderate limitations can provide a basis upon which an ALJ may discount the opinions of a treating physician reflecting greater limitations. Goff v. Barnhart, 421 F.3d 785, 791-93 (8th Cir. 2005).

In addition, as defendant points out, although the ALJ discounted Dr. Bhargava's opinions in her Medical Source Statement - Mental, the ALJ's findings are at times consistent with the

doctor's conclusions:

- The doctor found that plaintiff was markedly limited in following detailed instructions but not significantly limited in following simple instructions; and the ALJ's RFC limited plaintiff to simple, repetitive work.

- The doctor found that plaintiff was moderately limited at responding to supervisors and getting along with coworkers; and the ALJ' RFC limited plaintiff to limited contact with supervisors and coworkers.

- The doctor found that plaintiff should have limited contact with the public; and the ALJ's RFC restricted plaintiff from any contact with the public.

Thus, the ALJ evidently credited some of the doctor's opinions, at least to the extent she found support for them in the medical records. Choate v. Barnhart, 457 F.3d 865, 870 (8th Cir. 2006).

After considering all of plaintiff's arguments, I find that the ALJ not err by discounting the opinions of Dr. Bhargava as expressed in her Medical Source Statement - Mental.

## VII. PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY

Finally, plaintiff argues that the ALJ did not have substantial evidence in the record to support her finding of plaintiff's residual functional capacity (RFC). In support of this argument, plaintiff recounts the evidence that could arguably detract from the ALJ's conclusion and argues that the ALJ failed to provide a "bridge" between the medical evidence and the RFC.

I incorporate by reference the remarks made above concerning

53

the ALJ's conclusions about plaintiff's credibility and the discounting of Dr. Bhargava's opinions.

Here, the ALJ found that plaintiff had the RFC to perform a full range of sedentary work if she stopped abusing substances. My review of the records supports this conclusion. As to plaintiff's physical complaints, there is almost nothing to support her alleged physical restrictions. Plaintiff's back and neck problems have been treated conservatively through medication, and nothing in the clinical testing (x-rays, MRIs) supports her complaints of disabling pain. As to her mental problems, the medical records show that plaintiff's bipolar disorder is effectively controlled when she remains on her medications and refrains from using illicit drugs and "huffing" paint fumes.

On April 20, 2005, plaintiff was examined by Dr. Michael Clarke, M.D., F.A.C.S., for Medicaid (Tr. 250-51). After examining plaintiff, Dr. Clarke opined that she had very minor degenerative changes in her lower back and neck, but that these conditions should not prevent plaintiff from engaging in the work for which she had been trained (Tr. 251).

On April 11, 2006, plaintiff was examined by Dr. David Lutz, Ph.D., at the request of the agency (Tr. 281-88). The doctor noted that he attributed plaintiff's "dysfunctional personality

characteristics" to her "past drug usage" (Tr. 286). The doctor opined that plaintiff could understand and remember simple and complex instructions, and could sustain the concentration and persistence necessary for moderately complex tasks (Tr. 286). The doctor believed that plaintiff could interact in "at least" moderately demanding social situations and could adapt to her environment (Tr. 286). Dr. Lutz opined that if plaintiff suffered from bipolar disorder I, then his assessments regarding plaintiff's abilities to understand and remember instructions, sustain concentration and persistence, and her ability to social interact would need to be decreased substantially as she would have difficulty sustaining such behavior on a consistent basis (Tr. 286).

Plaintiff's April 11, 2006, description of her daily activities to Dr. Lutz portrays a person who is both active and engaged in everyday relationships (e.g., watching television, helping a friend's mother with chores, reading, listening to music, shopping, spending time with children, and performing yard work) (Tr. 281-88). Certainly, such a person is capable of performing sedentary work.

On May 23, 2006, Dr. Elisa Lewis, Ph.D., completed a Mental Residual Functional Capacity Assessment based on plaintiff's

medical records for the period from December 1, 2004, to May 23, 2006 (Tr. 289-301). Dr. Lewis found plaintiff to be markedly limited only in her ability to interact appropriately with the general public and to be moderately limited only in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes (Tr. 302-03).

After considering all of plaintiff's arguments, I find that the ALJ not err by finding that plaintiff has the RFC to perform sedentary work if she would stop abusing drugs and "huffing" paint fumes.

## VIII. CONCLUSIONS

I have reviewed the entire record and considered all of plaintiff's arguments, and conclude that substantial evidence supports the ALJ's decision. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


<u>/s/ Robert E. Larsen</u>
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
February 3, 2011